Thank you, Your Honor. May it please the Court, my name is Martha Hall. I represent the appellant, Mr. Dolamore. I would ask if I could reserve four minutes of time for rebuttal. Yeah, you know, you don't have to ask to reserve. You know, we have the little lights out there. Thank you. Thank you, Your Honor. The critical issue in this case goes right to the core of the Fourth Amendment. The Fourth Amendment itself requires that the place to be searched is particularly described. And in this case, we had a situation not where the constable blundered, but where the officers stumbled. Can I tell you something? I think the police did a very good job here, you know. So they were off. There was, what was it, 14-something and, you know, they were off. There was another, this other apartment where he lived in the back. Yeah, and that wasn't even an official address. I have several responses to you, Your Honor. First of all, the... They got a warrant, didn't they? Yes, they did. They got a warrant not to the house that they searched, not to the residence. The Fourth Amendment protects residences, living units, dwelling units, not buildings, not structures. You know, part of the problem in this case was there was a misunderstanding about what the Fourth Amendment protects. The Fourth Amendment protects even a bedroom within a single-family dwelling if that bedroom has been staked out as a separate dwelling unit. That is what the Fourth Amendment protects, a dwelling unit. Well, they knew that by getting a warrant. I mean, nobody was questioning that they needed a warrant. The question really is whether the inadvertent imprecision of the warrant after a reasonable investigation to establish precision in the address invalidates the warrant. Where we have problems, even if I agree with the Court all the way that it was a reasonable investigation that they got a warrant, the problem is at the point where they were in the courtyard or perhaps on the stairs, they see the numbers outside the second-floor apartment, which is 3124.5, which was staked out as a separate mailbox. Even if I say, okay, even then, let's give them the benefit of the doubt, because at that point I think they know clearly this is a separate dwelling unit. When they open the door and they see that there's a separate kitchen, they know it's a separate dwelling unit. What are you suggesting they do at that point? At that point, they're supposed to do exactly what Judge King says in Great House. They stop, they can secure the residence, and they apply for a modification or a telephonic warrant, indicating that they had the wrong residence that was actually very particularly described in the attachment and that they need a search warrant for 3124.5, which is a second-floor studio-type apartment on the back of the property, in which Mr. Dolemore resided. Was there an official address? It was not permitted, but there is no case that says it. It was not permitted. It was kind of a bootleg department, wasn't it? It doesn't matter. I know it doesn't matter, but... In Cannon and Schroeder and Great House, all of those cases, they discuss that it is not, we're not protecting the real property owner's, you know, definition of the parcel. We're protecting dwelling units. So even if it's not permitted, it's not an official address, the post office doesn't recognize it, that does not matter in the Fourth Amendment analysis. What matters in the Fourth Amendment analysis is was it a separate dwelling unit? Was it a place in which someone staked out their desire to keep it private, keep it separate? And this case is really in between Cannon and Great House. And in Great House, which is actually a very similar case, because it involved child pornography, it involved investigation that led to a particular computer, and in that case, it was a separate room within a single family residence. It was a house in which several different people rented rooms. And in that case, it was just a bedroom in the house, but there was a sign put on the door, do not enter, indicating that the person had staked out a separate place. And the police officers were told by the primary renter that he rents his bedroom. Now, in this case, even if we credit the investigation of the police officers all the way up to the execution of the warrant, by the time they climbed those stairs and saw those numbers outside the house, they knew that it was staked out as a separate dwelling unit. And certainly, when they opened the door and saw that there was a separate kitchen and a separate living space, they knew. The problem was, at that time, in contrast to the agents in Garrison and the agents in Herring, they didn't stop. They didn't say, okay, we've made a mistake, let's correct it. In Garrison, as soon as the police realized they made a mistake, they stopped. In Herring, as soon as the police realized they made a mistake, they stopped, although it was too late. Here, the agents should have stopped as soon as they realized there was a mistake. Why doesn't, I mean, the warrant itself says that they want a search warrant, it's a search warrant application to search the entire premises of Martin Dolamore, located at 3124 Menlo Avenue. Isn't that exactly what they searched? What they searched were his premises at 3124 and a half. Now the description in the warrant goes on to describe exactly the residence of Francesca Montoya, who lived in the front section of the house. But they knew from their own investigation that Mr. Dolamore entered from, you know, on a side gate and in the back and they had evidence that the internet service provider was, the address that he had given them was 3124. I don't see what put them unnoticed that this was, I mean, they searched the dwelling place they set out to search. They did not search the dwelling place of the front house. I think we can all agree that if agents went out and they had a search warrant that described a house across the street from the target, they could not go search the target's house. Even if they know that's where our target lives, oops, we just put in the address and the physical description of the house across the street. But, you know, it's a little bit as if you had a warrant to search Jane Smith's bedroom in the house located at 1000 South Broadway and, you know, Jane had put a sign on there that said Jacqueline's bedroom, but it was still her bedroom. It seems to me that the 3124.5 is not anything other than an odd label that he chooses to put in there that's unofficial. It's like putting up a sign saying Martin's house, which is what they were setting out to search. I disagree with you that they had a warrant to search his bedroom. If they had put in there... They had a search warrant to search the entire subject premises at 3124. And in specific, they were searching Martin Delamore's residence. But they never... And they did that. I'm sorry, Your Honor. They never told the magistrate that it was a multi-unit dwelling. And this gets back to a very firmly rooted rule of the Fourth Amendment that when you have a multi-unit structure, a warrant that authorizes the search of the entire structure without limiting it to the target's residence is void. But it did limit it to the target's residence. That's the point. It limited it to Martin Delamore's residence. So it would not have authorized them to search the woman who lived in the front. Nowhere in the attachment does it limit it. Nowhere in the attachment does it say this is limited just to Martin Delamore and the residence. In the attachment that says these are the premises to be searched, it does not say you can only search Martin Delamore's living unit at this multi-unit dwelling. The attachment describes precisely the front house that was resided in by Francesca Montoya. So this is not a case where they brought the information to the magistrate. They did not tell the magistrate it was a multi-unit dwelling. We have the government's indications... Well, it wasn't officially. It's more like the bedroom example. It wasn't officially. It wasn't officially, but if they knew that, they needed to tell the magistrate that. Well, how would they know that there were two units there? Well, they did know that there were two mailboxes that were there. Well, didn't they check with the post office? Well, they checked with the post office. They said that it wasn't a valid address, but I didn't hear anything or see anything about whether or not they asked about additional delivery of mail. Did they check with the utility companies? I believe that they did check with the utility company, but let me also refer the Court to the government's statements during the hearing. The government said, you know, we thought he rented a room or something like that. We just didn't know who lived where. We didn't know who lived where. And that is when they needed to do more work. They needed to stop at that point and find out who lived where and find out where Martin Dillon lived. If there were no one half above the door, if they were just simply roommates, would they have to get a different kind of warrant? If they know about it, yes, because it's a multi-unit dwelling. No, I didn't ask that. If they were just roommates in a house and two mailboxes out front and it's a single house and they're looking for computer items, as they are in this case. That's Great House. And to the extent that there is a stake made or something done to show this is my private residence, then, yes, they do. What the judge relied on in Great House were essentially two things. One, the do not enter sign on the door. And second, the fact that the officers were told he pays separate rent. If they know those two things, then, yes, what they're supposed to do is to get a separate warrant for that person's particular bedroom. And as the judge in Great House found, what they should have done was stop the search and apply for a modification of the warrant or to apply for a new warrant. And here we have even more that they knew about beforehand and also that they knew at the time of the execution of the warrant. Even if we give them the fact that they were maybe confused or didn't know where they were searching or who they were searching for where, they knew at the time that they mounted those stairs and saw the numbers on the outside, the 31, 24 and a half, that this was staked out as separate and certainly when they opened the door and saw the kitchen. It's a separate residence. Some residents have more than one kitchen. Well, that's correct. Well, the whole issue gets down to the absolute black letter law that if it's a multi-unit dwelling, it is a void warrant that gives them permission to search the entire structure. That is accepted. That's black letter. If they just describe the multi-unit dwelling, the entire structure, when there are multiple dwelling units and they don't limit it. Well, they checked those things. This is not a multiple-dwelling building. Right? They did stake the thing out. All the neighbors told them was that he comes in through the back. The law is that it's a multiple. It said he comes through the back. Right. But the law is that it's a multiple. What do you think the Supreme Court would do with this case? Well, I think that if they followed the multiple-unit dwelling law that they would have to find either that it was void or they would have to craft a new good-faith rule. I think that if this Court's going to affirm the decision, you would have to craft a new and different good-faith rule and I don't think that's the province of this Court. I don't think that... You know, we share your passion. We share your passion. You know, we're living in a real world, in a practical world and these officers from the cases that I see did a professional job. But they didn't... So they were off one-half the address. Some people could... That... That 3124 and a half Menlo Avenue wasn't even a postal address. Now, maybe they should have spoken to the mailman or the mailwoman. See, if they were good officers they would have done that. My father was a mailman. He knew everything about everybody in his district. You know, everything. If you ever want to know maybe we ought to put this in an opinion. Police, if you ever want to know what goes on better talk to the postman. We don't know whether or not the post officer told him that he delivered mail for Martin D'Olemore. We do know that he did deliver mail for Martin D'Olemore at 3124 and a half. How do we know that? Because it was submitted as an exhibit. Mail addressed to Martin D'Olemore at 3124 and a half. He put the extra mailbox up there and he didn't want to get his mail mixed up with other ladies. I think if the court is inclined to credit the officers, you need to give Mr. D'Olemore a hearing an opportunity for a hearing because essentially the court would be making a credibility determination where there has not been an opportunity to cross examine and where there is a conflict and dispute over the facts. We have Francesca Montoya's affidavit which actually contradicts the view this court has taken because Francesca Montoya says they told me that day that they knew he lived in the back house they were not going to search my house they had no intention to search my house. So what Francesca Montoya tells us is that perhaps the agents were not being totally forthright with the magistrate. They weren't revealing all the information they had and they knew it was a multi-unit structure and they chose probably in the heat of the competitive exercise of rooting out crime to go quickly to execute the warrant rather than dot all the i's and cross all the i's. You couldn't tell from the street that it was a multiple dwelling unit, could you? The law clerk's affidavit I believe says that you could tell from the back that they the officers we know did go down the back alley Mr. Dolemore's door faced onto the back alley and the officers do reference a garage that they could see from the back alley Well he wasn't living in the garage was he? I don't believe it was the garage But these are questions that if you're going to find for the government, I think Mr. Dolemore should have an opportunity to ask the agents on the stand. I think that if there is an indication to find that they acted in good faith or that they did an expert job or professional job at the investigation then he should have a hearing where he can cross examine those agents and explore whether or not that's in fact true And with that I'll submit Keep that in mind Good morning your honors May it please the court, Alessandra Serrano on behalf of the United States of America In this case there was no fourth amendment violation In this case the search warrant described with particularity and specificity the place to be searched and that it was Mr. Dolemore's residence located at 3124 Menlo Avenue As your honor correctly pointed out, attachment A which is at excerpts of record 228 specifically mentions the section which Mr. Dolemore resided, although they mistakenly thought it was a garage It's the same part of the It's the same location where attachment A describes a garage It's the same place in the defense declaration where they thought it was a garage. Apparently at some point in time the garage was turned into an unpermitted apartment and the record shows that the mailbox was installed just a few weeks before the search warrant was executed So in this case the search warrant did include the area in which Mr. Dolemore resided and it described that in attachment A Probable cause existed for the entire structure because of all of the checking and investigation that agents did including but not limited to the email address which Mr. Dolemore used came back to 3124 Menlo Avenue The internet protocol address in which the email was sent came back to 3124 Menlo Avenue The credit card in which he used to access the child pornography website came back to 3124 Menlo Avenue That's all at excerpts of record 188-190 And in fact Mr. Dolemore himself held himself out to reside at 3124 Menlo Avenue That was the address that he put on his California driver's license. That is the address he entered in the child pornography website. That is the address he provided to Cox Communications his internet service provider That is the address that he had his car registered to and so on and so forth And in this case when the agents did discover the two mailboxes as Judge Pregerson aptly noted they did follow up and determine whether this was a real place. They checked with the utility company and there was only one bill for the entire single family residence. They went to the county assessor's office. They went to the San Diego police department. They went to the post office to determine whether that was a legitimate address and at the time they applied for the warrant and at the time they executed the warrant there was no indication that 3124 and a half was just I think Judge Graber called it an odd label It was just a mailbox with no name on it and a number above the door And in fact when they executed the warrant they had no idea until they actually entered the residence that it was not part of the same house whether there was the government's position that the Fourth Amendment was not violated in this case. However, if the court does find a Fourth Amendment violation I think the recent Supreme Court case in Herring tells us the exclusionary rule is not an automatic remedy for all Fourth Amendment violations and because there was no police misconduct here I think the entire panel has noted the investigation that the officers did in this case and that the exclusionary rule would not be appropriate. With regard to the allegations that Ms. Hall raised in her opening statements about that the magistrate was never told that it was a multi-unit structure or the attachment doesn't limit it to limit the search to Mr. Dolomar those are all Frank's issues that should have been brought below but defense counsel below chose not to file Frank's motion. In fact in her comments in the argument she noted the steps that had been taken and her argument was mostly focused on whether the search warrant described the particularity. These new allegations that were raised for the first time in counsel's reply brief have no bearing here on this case. Is there anything in the record that would indicate that the officers searched for anything other than what was listed on attachment B? There is nothing in the record and I think Your Honor noted that this was a case where officers were looking for a computer because we had reason to believe that a computer was used to access a child pornography website. So in the attachment B which was not part of the record because it was not raised below also included bills and other types of things. I have it in front of me so it must have been. Oh, I'm sorry. Attachment B is part of the supplemental excerpts of record. Yes ma'am. Sony CPU, four ZIP disks, one floppy disk, etc. Is that what you're referring to? Correct. It was the electronic media, computers, disks, other type of electronic storage and other types of bills or that sort of thing that showed that it was Mr. Dallamar who was accessing the child pornography website. A few comments and then I will submit. First of all, the case that counsel raises, the Great House case, that's a district of Oregon case. It's not binding on this Court and I think that was absolutely different because of just on the facts. We're talking about a single family house with their different rooms rented but there were about six different computers in the house and the warrant was not limited to one particular person, one particular person using that computer and that was the problem with that case and in fact the motion to suppress was granted because the information in the warrant was considered stale. That was the main thing but Judge King did go on to talk a little bit about the lack of specificity in that particular warrant. With regard to the mail being delivered I think the government, I addressed that in my response brief that that was mail that was delivered after the execution of the case and so we have no idea if there was a change of address put in or etc. Unless the Court has any further questions I won't address the other issues that were raised concerning the constitutionality of statutes. So you're saying that the second mailbox was put in after the affidavit was approved? Yes. Wait a minute. I thought the mailbox was there but what you just said was that the mail that was introduced in evidence came later after the execution of the warrant but the physical box was there, wasn't it? The physical box was there. I'm saying the mail that was delivered there. Okay. The counsel submitted some letters at the hearing and I'm saying that there were three letters. Two letters had no postmarks. We have no idea when they were mailed. The third one was postmarked October 9th, some three months after the warrant was issued. What does that mean? Well, counsel is heavily relying upon the fact that mail was actually delivered to Martin Dallimore at 3124 and a half and my argument is that that mail that she puts in support of that was delivered after the agents obtained the warrant and after it was executed so we the fact that it happened after we're not looking at what happened after the warrant was executed. The mailbox was there. Correct. The physical mailbox was there. Thank you. If I could have just a minute. Sure. As the Court noted, Agent Meeks knew about the separate mailbox in July. He applied for the search warrant on August 11th, on or about August 11th and they executed the warrant on or about August 16th so he knew about the separate mailboxes prior to drafting the affidavit to the search warrant. There was no indication in the search warrant about the two different addresses and I would also like to point out to the Court again that Government Counsel at the hearing below indicated to the Court that they knew that there were multiple people living at that address. When you know that there are multiple dwelling units, that makes it a multiple unit structure and it comes under the law requiring you to have a specific warrant to the specific dwelling place of the target and if it's just a warrant for the entire structure, the cases hold that it's void. The Government wants to put this case into an exception to that general rule, but we need to understand that that's the starting point. That's the general rule. And then it's only if this case fits into one of those exceptions. As far as the officers knew, after they checked, this was one dwelling unit, they were told by a neighbor that this gentleman comes in through the back. But this is one reason that perhaps we should have a remand for a... No, he comes through the back, so that's why they waited in the back over there. But according to the affidavit of Francesca Montoya, the officers told her that day of the search that they knew that Martin Dullimore lived in the back and they had no intention of searching her residence, which was the residence described in Attachment A. Her residence is the aqua blue ranch house that faces Menlo. Mr. Dullimore's residence is the second-story apartment that faces the alley. So according to Francesca Montoya, the agents knew, which takes it out of garrison, the exception. So if this Court has any issue with which side of those competing facts to adopt on appeal, then the proper remedy is a remand so that those facts can be fleshed out. And we can ask Mr. Meeks, well, did the landlord tell you there was more than one tenant? Well, did the post office tell you he delivered mail to 3124 and a half? We can find out some of the answers to the questions that we're having to talk about now on a record that doesn't provide all the answers. Thank you, Your Honors. Were you the witness? Did you represent him before the trial court? I did not represent him before the District Court. But there was no Frank's? There was no Frank's issue before the District Court. If I were to take a guess, I would think my guess would be that the Frank sort of comes to light with the comparison of the declaration attached to the motions versus the search warrant affidavit. And it may be that counsel had not just had time to digest what I think is a conflict between those two. The fact that the declaration attached to the motion admits that they knew of the separate mailboxes, they knew he went to the district court.  there may have been some additional information. Also, I believe trial counsel only received the affidavit from Francesca Montoya the actual day of the hearing. And so maybe there was not a full digestion of all the facts, the potential conflicts. And yes, if there's a remand, I think that that is something that will be discussed. I'm sorry, Your Honor. So let the record show that. Go ahead. You want to say something? You know, there's more testifying going on in the audience than there is some time for the witness. The only thing that I would add is that trial counsel did have a copy of the search warrant affidavit some three months before she filed her motion. So certainly she could have filed a Frank's motion if she felt one was necessary, but again, she didn't have, she didn't do that because she found that the agent's affidavit. She had it three months before. Correct. All right. Thank you very much. Thank you, Your Honor. Got a lot of tough lawyers in San Diego. It's rough and tumble down there. I know, I know, yeah. Sort of like the Ronald Rolls. Okay. Okay, we'll call the next one. And this is U.S. versus Momeli Mensis. Versus Momeli Mensis.
judges: Pregerson, Graber, Wardlaw